UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | |
|---|---|
| BERENICE ANGOTTI, DANIEL BORRERO, RALPH E. COWLEY, JACK GRIFFITH, DONALD S. MUELLER, KENT D. RUSSELL, SR., BERNARD W. SCHREINER, and RAYMOND VALLI, on Behalf of Themselves and Others Similarly Situated, | Case No. 06-CV-0657 (PJS/JJG)  MEMORANDUM OPINION AND ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION |

Plaintiffs,

v.

REXAM INC.,

Defendant.

---

Sally M. Tedrow, O'DONOGHUE & O'DONOGHUE LLP, 4748 Wisconsin Avenue N.W., Washington, DC 20016; Mark W. Bay, PETERSON ENGBERG & PETERSON, 400 Second Avenue South, Suite 700, Minneapolis, MN 55401, for plaintiffs.

James P. McLoughlin, Jr., Alton L. Gwaltney III, MOORE & VAN ALLEN, 100 Tryon Street North, Suite 4700, Charlotte, NC 28202; Timothy E. Branson, DORSEY & WHITNEY LLP, 50 South Sixth Street, Suite 1500, Minneapolis, MN 55402, for defendant.

Defendant Rexam Inc. ("Rexam") decided to raise out-of-pocket costs for the prescription drug benefits that it provided to its retirees and then later decided to discontinue all medical and prescription drug benefits for retirees who were eligible for Medicare. Various lawsuits were filed, some by Rexam against the retirees, and some by the retirees against Rexam.

Three of those actions — involving multiple classes and subclasses — are pending before this Court.[1]

Plaintiffs in this particular action are individuals who retired from Rexam or one of its predecessor companies and whose health benefits have been terminated.  Plaintiffs represent a class of former Rexam employees (and their eligible beneficiaries) who retired under certain collective bargaining agreements ("CBAs") that Rexam negotiated with the International Association of Machinists and Aerospace Workers ("IAM").[2]  Plaintiffs contend that their health benefits were vested and that Rexam had no right to change or terminate them.  Plaintiffs have moved for a preliminary injunction, asking this Court to order Rexam to reinstate their medical and prescription drug benefits.

## I.  BACKGROUND

### A.  Procedural History

This case and the related cases have a tangled procedural history.  A substantially abbreviated summary of that procedural history will suffice for the purposes of the pending motion.

---

[1]*Rexam Inc. v. Slagerman*, No. 03-2998 (D. Minn. filed May 1, 2003); *Angotti v. Rexam Inc.*, No. 06-657 (D. Minn. transferred Feb. 21, 2006); *Baker v. Rexam Inc.,* No. 06-1627 (D. Minn. transferred Apr. 28, 2006).

[2]On October 10, 2006, the undersigned granted plaintiffs' motion for class certification and certified the following class: "All retirees, spouses and surviving spouses of retirees, who retired from a facility covered by a Basic Agreement negotiated between the IAM and Rexam Inc. or a predecessor."  Order at 2 (Oct. 10, 2006).

1.  Rexam I

Rexam raised out-of-pocket costs for prescription drug benefits in January 2002.  After the retirees protested, Rexam filed suit against the IAM, the United Steelworkers of America ("USWA"), a local USWA affiliate, and a number of individual retirees, seeking a declaration that it has the right to modify the terms of its various retiree health benefit plans.  *Rexam Inc. v. Slagerman*, No. 03-2998 (D. Minn. filed May 1, 2003) (*Rexam I*).  Judge Ann D. Montgomery certified five subclasses of defendant retirees and their eligible beneficiaries.  *Id.*, 2005 WL 1260914 (D. Minn. May 25, 2005); 2005 WL 2318957 (D. Minn. Sept. 22, 2005).  None of those subclasses contains IAM members; all contain retirees who had been represented by the USWA.

The following year, Judge Montgomery denied a motion by Rexam for summary judgment.  *Id.*, 2006 WL 435985, at *17 (D. Minn. Feb. 21, 2006).  Although, as noted, none of the subclasses contains IAM members, some of the contract language that Judge Montgomery examined was identical or nearly identical to some of the contract language that applies to the IAM plaintiffs in this case.  Judge Montgomery found that this contract language provided sufficient evidence of vesting to require a trial on the issue.  *Id.* at *5-9.

*Rexam I* was transferred to the undersigned shortly after he became a member of this Court on May 30, 2006.  In June, the undersigned conducted a lengthy hearing on several matters, including a request by Rexam for permission to move to reconsider Judge Montgomery's denial of its summary-judgment motion.  Following that hearing, the undersigned granted Rexam's request with respect to four of the five USWA subclasses.  Later, the undersigned granted summary judgment to Rexam with respect to three of those subclasses and with respect to some members of the fourth subclass.  *Id.*, 2006 WL 2530384, at *20.

Significantly, though, the undersigned did *not* grant summary judgment with respect to any subclass members who were subject to alleged vesting provisions that were identical or nearly identical to the alleged vesting provisions that control this action.  The undersigned agreed with Judge Montgomery that the vesting provisions were not sufficiently clear to support a grant of summary judgment.  The remaining claims in *Rexam I* will be tried before the undersigned beginning on November 29, 2006.

### 2.  Rexam II

In September 2005, Rexam announced that it would discontinue all medical and prescription drug benefits for Medicare-eligible retirees and beneficiaries as of January 1, 2006. Def.'s Am. Answer ¶ 26.  In response, plaintiffs in this action, along with five other IAM retirees, filed suit in the Northern District of California.  *Angotti v. Rexam Inc.*, No. 05-5264 (N.D. Cal. filed Dec. 20, 2005) (*Rexam II*).  Judge Claudia Wilken granted in part Rexam's motion to transfer venue and transferred the claims of some of the plaintiffs to this Court.[3]  *Id.*, 2006 WL 335284, at *7 (N.D. Cal. Feb. 14, 2006).

The plaintiffs whose claims remain before Judge Wilken moved for a preliminary injunction.  Several months later, the plaintiffs to this action did likewise by bringing the motion that is now before the Court.  On June 14, 2006, Judge Wilken granted the *Rexam II* plaintiffs' motion for a preliminary injunction and ordered Rexam to reinstate benefits for putative class members to the extent that they were entitled to those benefits on the dates of their retirements. *Id.*, 2006 WL 1646135, at *17 (N.D. Cal. June 14, 2006).

---

[3]Notwithstanding the case caption, which is a relic of the California case, the only named plaintiffs in this action are Ralph E. Cowley, Donald S. Mueller, and Raymond Valli.

Judge Wilken's opinion in *Rexam II* is carefully reasoned — and this Court largely agrees with its analysis — but, as will be described below, there are several important factual and legal distinctions between the claims pending in California and the claims pending here. Thus, Judge Wilken's opinion is of only limited guidance. Similarly, this Court's August 31 opinion in *Rexam I* addresses many of the same issues that are raised in this case. For that reason, and for the convenience of the reader, much of the analysis and language of the *Rexam I* opinion will be incorporated into this opinion. Again, though, there are important differences between the summary-judgment motion decided in *Rexam I* and the preliminary-injunction motion filed in this action.

### B.  Factual Background

Rexam is a large and apparently successful company that manufactures beverage cans and other packaging. Rexam is incorporated in Delaware and maintains its principal place of business in North Carolina. *Rexam I*, No. 03-2998, Am. Compl. ¶ 1. Over the past half-century, Rexam and its predecessors American Can Company, National Can Company, and American National Can Company have employed thousands of union members in approximately 140 plants. *Id.*, Am. Compl. ¶ 21; *id.*, Reilly Aff. ¶ 5, Jan. 31, 2005. For purposes of this opinion, Rexam and its predecessors will be referred to as "Rexam."

The IAM has represented groups of Rexam employees since at least the 1950s. *See, e.g.*, Martorana Decl. Ex. 2A; *Rexam I*, No. 03-2998, Pl.'s Br. Supp. Summ. J. Against USWA Ex. 1, Ex. 11. Over the years, Rexam and the IAM have negotiated a series of CBAs that provided health benefits to retirees. *See, e.g.*, Martorana Decl. Exs. 2(A)-2(J), 3, 4. Some of the CBAs were national in scope and covered employees in multiple plants throughout the country. *Id.* at ¶

4.  The parties refer to these national CBAs as "Basic Agreements."  *Id.*  Those Basic Agreements are at issue in this case.  *Rexam II* — the case still pending before Judge Wilken — involves "independent agreements" that cover only one or two plants.  The critical language of the Basic Agreements is different from the critical language of the independent agreements.  *See Rexam II*, 2006 WL 1646135, at *1-2.

Plaintiffs contend that the right of Rexam retirees to health benefits was vested in the Basic Agreements, and thus Rexam may not unilaterally modify or terminate those benefits.  Am. Compl. ¶ 23.  Plaintiffs allege that Rexam breached the Basic Agreements and violated its fiduciary duties by raising out-of-pocket costs for prescription drug benefits in January 2002 and, three years later, by announcing that it would discontinue all medical and prescription drug benefits for Medicare-eligible retirees and their beneficiaries as of January 1, 2006.  *Id.* at ¶¶ 25-26.

Plaintiffs filed *Rexam II* prior to January 1 and sought a temporary restraining order ("TRO").  After plaintiffs' motion was denied, *see Rexam II*, No. 05-5264, Order (Dec. 30, 2005), Rexam followed through on its plan by terminating health benefits for Medicare-eligible retirees and beneficiaries on January 1.  Plaintiffs now move for a preliminary injunction requiring Rexam to reinstate the terminated benefits.

## II.  ANALYSIS

### A.  *Standard of Review*

This Court must consider four factors in deciding whether to grant a preliminary injunction:  (1) the threat of irreparable harm to the movant; (2) the balance between this harm and the harm that granting the injunction would inflict on the non-movant; (3) the probability

that the movant will succeed on the merits; and (4) the public interest.  *See Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981).  A preliminary injunction is an extraordinary remedy, and the party seeking preliminary relief bears the burden of establishing all of the *Dataphase* factors.  *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003).

No single *Dataphase* factor is determinative.  *See Hill v. Xyquad, Inc.*, 939 F.2d 627, 630 (8th Cir. 1991).  When the threat of irreparable injury is great, a court may grant an injunction even if the likelihood of success on the merits is iffy.  *See Dataphase*, 640 F.2d at 113. Conversely, where the likelihood of success is great, the moving party may need to show less in the way of irreparable harm, *see id.* — although a complete failure to show irreparable harm is sufficient reason to decline to issue a preliminary injunction, *see Blue Moon Entm't, LLC v. City of Bates City*, 441 F.3d 561, 564 (8th Cir. 2006).  Ultimately, a court must decide whether the balance of equities so favors the movant that the court must intervene to preserve the status quo until the merits are determined. *See Hill*, 939 F.2d at 630.

Rexam argues that plaintiffs bear a heightened burden in this case because plaintiffs are seeking to gain through a preliminary injunction the same relief they would obtain after a trial on the merits.  *See Sanborn Mfg. Co. v. Campbell Hausfeld/Scott Fetzer Co.*, 997 F.2d 484, 486 (8th Cir. 1993).  The Court disagrees.  Plaintiffs sought to preserve the status quo by filing their motion for a preliminary injunction in California *before* Rexam terminated their benefits on January 1.  That motion was not decided before Judge Wilken transferred plaintiffs' claims to this Court at Rexam's request.  After the claims were transferred, plaintiffs promptly renewed their motion.  The fact that plaintiffs are now seeking to have benefits reinstated — instead of seeking to have benefits preserved — is due to the fact that Rexam, after successfully opposing

plaintiffs' motion for a TRO, cut off all of plaintiffs' benefits on January 1, knowing full well

that a motion for a preliminary injunction was pending.  Rexam then successfully moved to

transfer plaintiffs' claims to this Court, delaying resolution of plaintiffs' motion.  This is a

classic case of plaintiffs seeking to preserve the status quo, and Rexam is in no position to ask

that plaintiffs meet a heightened burden.

### B.  Probability of Success on the Merits

#### 1.  Vesting Under ERISA

Plaintiffs and Rexam agree that the retiree health benefit plans at issue in this case are

"employee welfare benefit plans" for purposes of the Employee Retirement Income Security Act

of 1974 ("ERISA"), 29 U.S.C. §§ 1001 et seq.  Therefore, the question whether Rexam has the

right to modify or terminate those plans is governed by ERISA.  *See John Morrell & Co. v.*

*United Food and Commercial Workers Int'l Union*, 37 F.3d 1302, 1303 (8th Cir. 1994).

ERISA makes a critical distinction between pension plans and welfare plans:  "While

pension plans are subject to ERISA's stringent vesting requirements, 29 U.S.C. § 1053 . . . ,

welfare plans are specifically exempt from such requirements.  29 U.S.C. § 1051." *Anderson v.*

*Alpha Portland Indus., Inc.*, 836 F.2d 1512, 1516 (8th Cir. 1988).  In other words, an employer

such as Rexam may unilaterally modify or terminate health benefit plans unless that employer

has entered into a contract under which the employer has waived that right — i.e., agreed that the

health benefits will be vested.  *See Morrell*, 37 F.3d at 1303-04.  Congress deliberately chose to

exempt health benefits from the vesting requirement — and for good reason:

> Congress evidenced its recognition of the need for flexibility in rejecting the
> automatic vesting of welfare plans.  Automatic vesting was rejected because the
> costs of such plans are subject to fluctuating and unpredictable variables.
> Actuarial decisions concerning fixed annuities are based on fairly stable data, and

vesting is appropriate.  In contrast, medical insurance must take account of inflation, changes in medical practice and technology, and increases in the costs of treatment independent of inflation.  These unstable variables prevent accurate predictions of future needs and costs.  While these plaintiffs would be helped by a decision in their favor, such a ruling would not only fly in the face of ERISA's plain language but would also decrease protection for future employees and retirees.

*Moore v. Metropolitan Life Ins. Co.*, 856 F.2d 488, 492 (2d Cir. 1988).

Put another way, vesting health benefits is a big deal.  In this case, for example, plaintiffs argue that Rexam has no choice but to provide millions of dollars of health benefits to hundreds of retirees and their beneficiaries for dozens of years — no matter the cost of medical care, no matter the demand for medical services, and no matter the financial condition of the company.  This is obviously not a commitment that any rational employer would undertake lightly.  It defies common sense to believe that an employer would assume such an enormous burden — or that employees would win such an enormous benefit — without someone making sure that the commitment was reduced to writing.

Reflecting this common-sense notion, the Eighth Circuit places on the employees the burden of proving that the employer agreed to vest health benefits.  *Barker v. Ceridian Corp.*, 122 F.3d 628, 634 (8th Cir. 1997); *Anderson*, 836 F.2d at 1517.  Not only must the employees prove the existence of a vesting agreement, but, as the Eighth Circuit has repeatedly held, the employees must prove that the agreement was "incorporated, in some fashion, into the formal written ERISA plan."  *United Paperworkers Int'l Union v. Jefferson Smurfit Corp.*, 961 F.2d 1384, 1386 (8th Cir. 1992); *see also Barker*, 122 F.3d at 633 (quoting *United Paperworkers*); *Jensen v. SIPCO, Inc.*, 38 F.3d 945, 949 (8th Cir. 1994) (same).

In a footnote to a recent opinion, the Eighth Circuit suggested that an intent to vest health benefits must be "clear." *Stearns v. NCR Corp.*, 297 F.3d 706, 712 n.3 (8th Cir. 2002). Over the years, though, the Eighth Circuit has often indicated that health benefits can be vested by an ambiguous provision of a CBA, as long as that provision is reasonably susceptible of being interpreted to provide vesting. *See, e.g., Jensen*, 38 F.3d at 950, 953 (affirming judgment for retirees although the relevant language was "at most an ambiguous expression of an intent to vest retiree benefits"); *Local Union No. 150-A, United Food and Commercial Workers Int'l Union v. Dubuque Packing Co.*, 756 F.2d 66, 69 (8th Cir. 1985) (finding language that implied that benefits were to continue sufficient to require examination of extrinsic evidence). In other words, the employees must, at a minimum, point to a provision of a CBA or other agreement — a provision that, in turn, is incorporated into a formal ERISA plan — that is reasonably susceptible of being interpreted as a commitment by the employer to vest health benefits.

"[O]rdinary contract construction principles should be used to determine if the benefits are vested." *DeGeare v. Alpha Portland Indus., Inc.*, 837 F.2d 812, 815 (8th Cir. 1988), *vacated and remanded on other grounds sub nom. DeGeare v. Slattery Group, Inc.*, 489 U.S. 1049 (1989); *see also Howe v. Varity Corp.*, 896 F.2d 1107, 1109 n.4 (8th Cir. 1990) ("[B]asic contract interpretation principles . . . apply."). The Court must first examine the governing documents, ignoring the extrinsic evidence. If the documents clearly provide that health benefits are vested, then the benefits are vested. If the documents clearly provide that the health benefits are not vested — or if the documents contain nothing that could reasonably be interpreted as a commitment to vest — then the benefits are not vested. If and only if the documents contain a provision that is ambiguous, but that could reasonably be understood as a commitment to vest,

-10-

will extrinsic evidence be consulted.  *See Howe*, 896 F.2d at 1110 ("As a general rule, . . .

extrinsic evidence may not be relied upon where the documents are unambiguous on their

face."); *see also Wilson v. Moog Auto., Inc. Pension Plan & Trust for U.A.W. Employees*, 193

F.3d 1004, 1009 (8th Cir. 1999); *Barker*, 122 F.3d at 633, 634-35, 638; *DeGeare*, 837 F.2d at

816; *Anderson*, 836 F.2d at 1517.

### 2.  Intrinsic Evidence

#### a.  Language Consistent With Vesting

As just described, an employer (such as Rexam) has the right unilaterally to modify or

terminate a welfare benefit plan (such as the health benefit plans covering Rexam retirees) unless

the employer has agreed not to do so — that is, unless the employer has agreed that the benefits

provided under the plan are vested.  *See Ravenscraft v. Hy-See Employee Ben. Plan & Trust*, 85

F.3d 398, 401 (8th Cir. 1996).  Whether the health benefits of a particular retired worker are

vested usually depends on the terms of the CBA and the ERISA plan that were in effect at the

time the worker retired.  Thus, the likelihood that plaintiffs will succeed in proving that their

health benefits are vested depends largely on the terms of the Basic Agreements negotiated by

Rexam and the IAM over the years, as well as on the various plans that Rexam has implemented

pursuant to those Basic Agreements.

At the Court's request, plaintiffs have produced a chart summarizing the relevant CBAs

and insurance plans, and in particular the language on which plaintiffs rely in contending that

their benefits are vested.  *See* Pls.' Summ. Provs. Under CBAs and Retiree Benefit Plans, June

16, 2006.  Plaintiffs rely most heavily on a clause that consistently appears in health benefit

plans that were either attached to CBAs or incorporated by reference into CBAs.  The clause —

typically entitled "When Your Insurance Ceases" — appears at least as early as 1971[4] and

continues to appear until at least April 1, 2005.  *Id.*  Although the language of the clause varies

slightly over the years, in each plan the clause states: "Your medical expense benefits

discontinue upon your death.  Your death will not affect the continuance of benefits for your

spouse . . . ."  *Id.*  The clause goes on to identify when coverage for "your spouse" will

terminate; generally speaking, the clause states that the coverage will terminate on the spouse's

remarriage, with some subsequent modifications not relevant here.  *Id.*

The purpose of this "discontinue upon your death" language is unclear.  A retiree hardly

needs to be told that his or her health benefits will discontinue upon his or her death.

Presumably, every retiree knows that, after he or she dies, the Rexam health benefit plan will not

cover medical expenses that he or she incurs in the afterlife.  What, then, is the purpose of this

language?

One possibility — suggested by Rexam — is that the language is essentially meant to

"vest" health benefits, but only to the extent that those benefits are provided by the CBA.  In

other words, if the CBA provides for three years of health benefits, this language is intended to

---

[4]Plaintiffs have submitted CBAs dating back to 1968.  Martorana Decl. Exs. 2(A)-2(J).
Until 1981, the CBAs themselves contained the provisions of the retiree insurance plan, which
was attached as an appendix to the CBA.  *Id.* at Ex. 2(A)-2(D).  Beginning in 1981, the insurance
plan was set forth in a separate document.  *E.g., id.* at Ex. 2(E)-2(J), 3-4.  Plaintiffs have
provided two insurance plans, dated 1981 and 1987, which are the "group insurance plans"
referenced in the later CBAs.  *E.g.*, *id.* at Ex. 2(J) at 48-49.  There are several gaps in the record,
however; the insurance plan referenced in the 1968 CBA is not available, *id.* at Ex. 2(A), and,
although plaintiffs' summary of provisions refers to "Extension Agreements" extending previous
CBAs for the years 1984-86 and 1989-93, it does not appear that these agreements are among the
documents supporting plaintiffs' motion.  Rexam does not dispute that these documents exist,
however, nor that the alleged vesting language covers all the class members in this action.
*Rexam I*, No. 03-2998, Pl.'s Br. Supp. Summ. J. Against IAM 11.

say to the retiree:  "You are guaranteed the three years of health benefits provided in this CBA.

Nothing short of your death can cause you to lose health benefits before the end of that three-

year period."

Another possibility — suggested by plaintiffs — is that the language is meant to vest

health benefits *for life*.  Plaintiffs interpret this provision to apply not just to the few years of

health benefits provided under a particular CBA, but to health benefits generally.  And plaintiffs

interpret this provision as though the word "only" appeared after "discontinue," to wit:  "Your

medical expense benefits discontinue *only* upon your death."  Put differently, plaintiffs interpret

this provision as though it read:  "Company-sponsored medical expense benefits will continue

until your death."

Both interpretations are plausible, but also problematic, which is why the clause is

ambiguous.  Because the clause is ambiguous, this case will likely have to be tried.  What is

likely to happen at that trial?  Are plaintiffs likely to succeed on the merits?  Just how strong is

this alleged vesting language?  A comparison with clauses relied on by retirees in other cases is

informative.

The "discontinue upon your death" language provides stronger evidence of vesting than

the language analyzed by this Court in granting summary judgment with respect to several

USWA subclasses in *Rexam I*.  Among the provisions relied on by the USWA retirees in

*Rexam I* were clauses describing health benefits provided to the surviving spouse of an *active*

employee, clauses describing health benefits provided to the spouse of a retiree after the retiree's

death, and clauses that did not themselves vest retiree health benefits, but instead hinted that

such benefits may have been vested at some unspecified time in the past under the terms of some

unspecified agreement. By contrast, the "discontinue upon your death" language cited by the plaintiffs in this action can reasonably be understood to provide that health benefits provided to a retiree will discontinue only on the retiree's death.[5]

At the same time, the "discontinue upon your death" language provides weaker evidence of vesting than the language analyzed by Judge Wilken in granting a preliminary injunction in *Rexam II*. For example, a number of the *Rexam II* CBAs state: "Major medical coverage will be extended to cover retired employees for their lifetime." *Rexam II*, 2006 WL 1646135, at *1. Similarly, a recent *Rexam II* CBA contains the following language: "You[r] coverage is continued for the rest of your life." *Id.* Obviously, these clauses are much more explicit in vesting health benefits for retirees than the language being considered here.

Plaintiffs also compare the "discontinue upon your death" language on which they rely to the vesting language considered by the Eighth Circuit in *Anderson* and *Morrell*. In *Anderson*, the operative CBA stated, "[f]or future retirees, Company will pay full costs of all group insurance for them and their dependents until death of retiree." *Anderson*, 836 F.2d at 1518 (quotation omitted). The Eighth Circuit described this language, standing alone, as "highly probative of intent to vest benefits." *Id.* Plaintiffs claim that this language is almost identical to the relevant language in this case.

The Court disagrees. The language in *Anderson* (a promise that the company "will pay full costs . . . until death") is stronger evidence of vesting than the language here (a statement that benefits "discontinue upon your death"). The former affirmatively commits the employer to

---

[5]For that reason, the fact that Rexam received summary judgment with respect to some of the USWA subclasses in *Rexam I* does not mean that Rexam will receive summary judgment with respect to the IAM plaintiffs in this case.

do something until the death of the retiree; the latter simply defines one circumstance (perhaps not the only circumstance) under which benefits (perhaps only the three or four years of benefits provided by the CBA) will cease.  Moreover, the Court notes that the language in *Anderson* — although more probative of vesting than the language here — was ultimately found to be insufficient to overcome other evidence that the company did not intend to vest benefits. *Anderson*, 836 F.2d at 1518.

In *Morrell*, the plaintiffs relied on the following language in the CBA: "When a Retired Employee dies who has selected a joint and survivor form of pension, the above coverage shall continue for the surviving spouse and dependent children until the earlier of the surviving spouse's death or remarriage."  *Morrell*, 37 F.3d at 1307.  The Eighth Circuit observed that such language supports the argument that eligible survivor benefits are vested, citing *Dubuque Packing Co.*, 756 F.2d at 69-70.  *Morrell*, 37 F.3d at 1307.  Once again, however, the court in *Morrell* found the language ambiguous and held that it could not overcome other contract provisions that were inconsistent with vesting.  *Id.* at 1307-08.

In short, the "discontinue upon your death" language on which plaintiffs rely, when considered in isolation, does indeed provide evidence of vesting — probably enough evidence to deny Rexam summary judgment in this case.  But that language is not terribly strong, especially when compared to the language examined by Judge Wilken in *Rexam II* and the language examined by the Eighth Circuit in *Anderson*.

### b.  Language Inconsistent With Vesting

Unfortunately for plaintiffs, the "discontinue upon your death" language will not be viewed in isolation.  Rather, the factfinder will have to harmonize that language with other

language in the applicable CBAs and plans.  *See Barker*, 122 F.3d at 637; *Anderson*, 836 F.2d at

1519.  The closer that a factfinder looks at these other clauses, the weaker that the "discontinue

upon your death" language will appear.

Consider the duration clauses.  The Eighth Circuit has advised employers who are

"'adamant against assuming perpetual obligations'" to "'eliminate all doubt by insisting on a

clause that makes any entitlement to health benefits granted by the agreement expire on [a

specific date].'"  *Morrell*, 37 F.3d at 1307 (quoting *Bidlack v. Wheelabrator Corp.*, 993 F.2d

603, 609 (7th Cir. 1993)).  Where an employer has done so, its decision must be respected, as

"[i]t would render the durational clauses nugatory to hold that benefits continue for life even

though the agreement which provides the benefits expires on a certain date."  *Anderson*, 836

F.2d at 1519; *see also Morrell*, 37 F.3d at 1307 (quoting *Anderson*).

Rexam did exactly what the Eighth Circuit advised employers to do.  From 1968 until

2002, all of the Basic Agreements that Rexam negotiated with the IAM contained a duration

clause that specifically limited Rexam's commitment to provide health benefits.  The language

changed slightly over the years, but it was always substantially identical to the following

provision in the 1968 CBA:

> Notwithstanding any other provision of this Agreement, Article 11, Group
> Insurance Plan, shall remain in effect until and including June 30, 1971.
> However, any changes in the Insurance Plan (Article 11) negotiated prior to
> March 31, 1971, shall be effective subsequent to June 30, 1971.

Martorana Decl. Ex. 2(A) at R000088; *see also id.* at Exs. 2(B)-2(I); *Rexam I*, No. 03-2998, Pl.'s

Br. Supp. Summ. J. Against IAM 8.

This duration clause is powerful evidence of non-vesting — and, it should be noted, also

helps to distinguish this case from *Rexam II*, where the CBAs examined by Judge Wilken did not

-16-

incorporate specific duration clauses.  *Cf. Rexam II*, 2006 WL 1646135, at *11.  The duration

clause begins with the words "[n]otwithstanding any other provision of this Agreement," making

it clear that the clause supersedes everything else in the CBA — including any other clause

which might be interpreted to provide evidence of vesting.  The clause goes on to cite the article

of the CBA in which the employer commits to provide health benefits.  And then the clause

concludes by stating that that commitment is "in effect" until a particular date.

When the agreement, on its face, provides that the employer's commitment to provide

health benefits expires on a date certain, and when that provision explicitly supersedes "any

other provision" of the agreement, then it is about as clear as can be that the health benefits are

not vested.  Moreover, although the clause contemplates that changes to the health benefit plan

will not become effective until after the CBA expires, the fact that changes could be negotiated

at all is inconsistent with the notion of lifetime vesting.  *See Morrell*, 37 F.3d at 1307 ("[T]he

fact that modifications were routinely negotiated is fundamentally inconsistent with the notion

that *any* retirement health benefits were *ever* vested.") (emphasis in original).

It would be a struggle to find ambiguity in this duration clause.  One could argue, for

example, that the clause merely provides that the employer's commitment to provide health

benefits "shall remain in effect until and including June 30, 1971."  This is ambiguous, one could

argue, because the clause does not say that the commitment remains in effect "only" until

June 30, 1971, or that the commitment "ends" on June 30, 1971.  In other words, while the

clause clearly commits the employer to provide health benefits until June 30, 1971, it is silent

about what happens after that date.  Hence ambiguity, and hence the need to consult extrinsic

evidence.

This would be a wholly implausible reading of the duration clause.  One need only consider the fact that many of the CBAs include general duration clauses that are applicable to the CBAs as a whole and that use the exact same "shall remain in effect until and including" language that is found in the specific duration clauses that are applicable to the commitments to provide health benefits.  No one can seriously contend that the CBAs extended beyond the dates identified in the general duration clauses.  CBAs, like other contracts, must be interpreted as a consistent whole.  *See Anderson*, 836 F.2d at 1519.  There is no reason why the "shall remain in effect until and including" language should mean one thing in the general duration clauses but something entirely different in the specific duration clauses.

In addition to the duration clauses, Rexam points to the reservation-of-rights clauses that appear in each insurance plan.  In granting plaintiffs' motion for a preliminary injunction in *Rexam II*, Judge Wilken noted that "Rexam's argument [that benefits are not vested] would be more persuasive if the CBAs contained a reservation of rights clause or some other more direct indication of an intent not to vest health benefits."  *Rexam II*, 2006 WL 1646135, at *11.  Here, by contrast, there is an express reservation-of-rights clause.  Until 1987, all the plans contained the following language:

> [The company] expects to continue this Plan indefinitely, but necessarily reserves the right to amend, modify, or discontinue the Plan in the future in conformity with applicable legislation and also subject to any applicable collective bargaining agreement.

Martorana Decl. Exs. 2(B)-2(D), 3.  After 1987, the clause was identical, except for the deletion of the phrase "and also subject to any applicable collective bargaining agreement."  *Id.* at Ex. 4.[6]

---

[6]Rexam argues that a stronger reservation-of-rights clause took effect in 1994, when it adopted a plan that it refers to as "Plan 583."  Judge Montgomery has already determined that

-18-

Plaintiffs argue that this clause is ambiguous and point out that Judge Montgomery, in *Rexam I*, found the clause to be ambiguous. 2006 WL 435985, at *8. Judge Montgomery found that the clause could be interpreted in one of two ways: "1) the company has no power to modify or terminate the plan, unless the company is required by law or the CBA to modify or terminate the plan, or 2) if the company exercises its right to modify or terminate the plan, it must ensure that its modification or termination complies with applicable law or the CBA." *Id.*

It is important to note that Judge Montgomery made this finding in the context of a motion for summary judgment, when the Court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *See Ludwig v. Anderson*, 54 F.3d 465, 470 (8th Cir. 1995). Here, by contrast, the Court must determine plaintiffs' ultimate likelihood of success on the merits. The fact that plaintiffs may survive summary judgment does not mean that plaintiffs are likely to succeed. *Cf. Minn. Ass'n of Nurse Anesthetists v. Unity Hosp.*, 59 F.3d 80, 84 (8th Cir. 1995).

The undersigned agrees with Judge Montgomery that the reservation-of-rights clause is susceptible of two plausible interpretations, but it appears to the undersigned that Rexam's reading of the clause is the more natural. The clause begins by stating that the company "expects" to continue the health benefit plan indefinitely. This is the language of prediction, not of legal obligation. The clause goes on to reserve to Rexam the "right to amend, modify, or discontinue the Plan in the future" — as long as, in amending, modifying, or discontinuing the plan, Rexam "conform[s] with applicable legislation" and with "any applicable collective

_____

the Plan 583 clause is not operative because Rexam did not amend its summary plan description to reflect the change. *Rexam I*, 2006 WL 435985, at *8. The Court will therefore confine its analysis to the earlier clauses.

bargaining agreement." That appears to be the only restriction on Rexam's ability to change the health benefit plan.

Plaintiffs' reading to the contrary — that Rexam cannot change the plan at all, unless Rexam is forced to do so by legislation or by a CBA — is a stretch.[7] It does get some support in the use of the word "necessarily." But it seems inconsistent with the clause as a whole. It is inconsistent with the language of expectancy. It is inconsistent with the broad terms of the reservation-of-rights language ("amend, modify, or discontinue"). It is inconsistent with the placement of the conditioning language after the language on amending rather than after the language on continuing. And it is simply puzzling: Rexam — like everyone else — has to obey the law; Rexam hardly needs to reserve its right to do so. And, if health benefits for retirees are indeed vested, then those benefits cannot be reduced or discontinued in a CBA. Why, then, would Rexam reserve the right to discontinue health benefits for retirees when forced to do so by a CBA, when no CBA could force Rexam to discontinue health benefits for retirees?

In short, the reservation-of-rights clauses, coupled with the duration clauses, provide strong intrinsic evidence that retiree health benefits were not vested. Rexam also points to the fact that the applicable CBAs and plans include continuation clauses and coordination-of-benefits clauses — two types of clauses that the Eighth Circuit considers "inconsistent with vesting." *Morrell*, 37 F.3d at 1307. The parties debate how much weight to give to these

---

[7]The Third Circuit found a similar reservation-of-rights clause to provide sufficient evidence of vesting to defeat an employer's motion for summary judgment. *See Alexander v. Primerica Holdings, Inc.*, 967 F.2d 90 (3d Cir. 1992). The Court does not find the Third Circuit's analysis persuasive for the reasons stated in its Memorandum Opinion and Order dated August 31, 2006 in *Rexam I*. More importantly, the Third Circuit, like Judge Montgomery, was answering the question whether two readings of the reservation-of-rights clause were plausible, not the question whether one reading was *more* plausible than the other.

clauses; the Court agrees with plaintiffs that the continuation clauses and especially the coordination-of-benefits clauses are rather weak evidence of an intent not to vest. But that does not help plaintiffs much. Weak evidence of non-vesting added to strong evidence of non-vesting equals strong evidence of non-vesting. The intrinsic evidence favors Rexam.

### 3. Extrinsic Evidence

Both sides offer extrinsic evidence to support their interpretations of the CBAs and plans. The IAM offers testimony from company and union officials who believe that retiree health benefits are vested for life. *See, e.g.*, Alexander Dep. 36 (stating that Rexam could only change benefits if a change in the law required it); Buly Dep. 109 (interpreting the "discontinue upon your death" language as a promise that benefits would continue until death); Giudice Dep. 69-70 (testifying that the reservation-of-rights clause was meant to allow the parties the necessary flexibility to comply with changes in the law); *but see* Barratt Dep. 75 ("[W]e always believed that we had the right to make changes to current retirees.").

To rebut this evidence, Rexam offers evidence that IAM union negotiators have known for years that Rexam considered retiree health benefits to be non-vested, as well as evidence that Rexam rebuffed every attempt by the IAM to add explicit vesting language or delete references to Rexam's right to modify benefits. *See, e.g.*, Newell Dep. 194-95, 201-02, 217-18. Rexam also offers evidence that it has modified retiree health benefits over the years in a manner inconsistent with vesting. *See Rexam I*, 2006 WL 435985, at *9. Rexam portrays these changes as being many, substantial, and harmful to the retirees. Rexam argues that the fact that the changes were made, and the fact that the IAM and the retirees did little or nothing to protest the changes, provide strong evidence that health benefit plans were not vested. *See Morrell*, 37 F.3d

at 1307 ("[T]he fact that modifications were routinely [made] is fundamentally inconsistent with the notion that *any* retirement health benefits were *ever* vested.").  By contrast, plaintiffs portray the changes as being few, insubstantial, and, in some cases, beneficial to the retirees.  In the eyes of plaintiffs, the fact that the IAM and the retirees went along with the changes is not evidence of much of anything.

The Court has not been able to sift through the voluminous extrinsic evidence with great care.  For example, the Court has not tried to figure out how much relative responsibility each witness bore for the CBAs and plans at issue.  At this point, it suffices to say that both sides will be able to introduce a considerable amount of extrinsic evidence supporting their interpretations.

### 4.  Conclusion

If the factfinder in this case were going to consider only the "discontinue upon your death" clause and the extrinsic evidence, plaintiffs would stand a good chance of prevailing, especially as their case has more "jury appeal" than Rexam's.  Rexam is, after all, a successful company seeking to make a healthy bottom line even healthier by cutting off medical benefits to the retirees who helped build Rexam into the company it is today.  Rexam may have the legal right to act in this manner toward its retirees, but the factfinder is unlikely to be predisposed in Rexam's favor.

That said, the factfinder in this case will not be considering only the alleged vesting language and the extrinsic evidence.  Rather, the factfinder will have to consider the other intrinsic evidence, including the duration clauses, the reservation-of-rights clauses, the continuation clauses, and the coordination-of-benefits clauses.  Taken together, these clauses provide strong evidence of non-vesting.  As the Eighth Circuit has instructed,

> "a contract should be construed so as to give effect to all the contract's provisions. Similarly, if two clauses of a contract appear to be in conflict, the preferred interpretation is the one that gives a harmonious interpretation to the clauses in order to avoid rendering either one nugatory."

*Barker*, 122 F.3d at 637 (quoting *Johnson Controls, Inc. v. City of Cedar Rapids*, 713 F.2d 370, 374 (8th Cir. 1983) (citation and quotation omitted)).  Plaintiffs' construction of the "discontinue upon your death" clause is plausible in isolation, but plaintiffs are going to have a difficult time reconciling that interpretation with the other clauses in the CBAs and plans.  For that reason, the Court cannot find that plaintiffs are likely to succeed on the merits of their ERISA and LMRA claims.

### C.  Threat of Irreparable Harm

Where, as here, those seeking a preliminary injunction are not likely to succeed on the merits, the injunction may be granted only if there is strong evidence that, in the absence of the injunction, the movants will suffer harm that is significant and irreparable.  *See Dataphase*, 640 F.2d at 113.  Evidence of that magnitude does not exist in this case.

Without question, some members of the plaintiff class will suffer harm.  Plaintiffs offer affidavits from five retirees or spouses of retirees indicating that they are suffering financial hardship due to their increased prescription drug costs; some of them, to save money, have stopped taking medication or cut pills in half.  Stryker Decl. ¶ 8; Cowley Decl. ¶ 8; Tierson Decl. ¶ 8; Demarse Decl ¶ 8; DeMariano Decl. ¶ 8.  Plaintiffs also offer evidence from a health care actuary indicating that, to replace Rexam's medical benefit plan, a retiree would likely purchase what is known as a "Medigap" plan, at a monthly per-person cost ranging from under one hundred dollars to several hundred dollars, depending on age and geographical location.  Atkinson Aff. ¶ 13.

In response, Rexam submits an affidavit from Jeff Ries ("Ries"), a senior associate at Mercer Health and Benefits, LLC, a "global benefits consulting firm."  Hardin Aff. ¶ 2; Ries Aff. ¶ 2.  Ries examined the five declarations from retirees or spouses and questions how severely those declarants have been harmed.  For example, Ries offers evidence that declarant Anthony DeMariano is paying approximately $25 more per month under his current plan than he did under Rexam's plan.  Ries Aff. ¶ 7-8.  Ries also testifies that several Medicare Part D plans are available to declarants Laverne Tierson and Neil Demarse and that at least one plan available to each would result in an increased monthly cost of $36.65 for Tierson and $96.16 for Demarse.  Ries Aff. ¶¶ 5-14.  More importantly, Ries examined Rexam's medical claim and prescription drug payments for *all* Medicare-eligible members of the plaintiff class and found that, out of approximately 1446 Medicare-eligible class members, Rexam paid less than $100 per *year* in medical claims for 1206 of them, and less than $100 per *month* in prescription drug payments for approximately 898 of them.  Ries Aff. ¶¶ 15, 17.

Rexam argues vigorously that there is no threat of irreparable harm because the hardship to retirees is entirely financial.  Rexam further contends that any emotional distress felt by the retirees may not be taken into account.  The Court disagrees on both points.  Even accepting Rexam's evidence, the retirees are still suffering considerable harm, some of which is irreparable.  One hundred dollars per month can be a lot of money to a retiree on a fixed income.  Skipping medications — or cutting pills — can lead to physical problems or even shorten lives, harms that cannot be undone with money.  And, of course, the purpose of insurance is not just to pay bills, but to give policy holders peace of mind by assuring them that bills will be paid.  Rexam's actions have robbed the company's retirees of that peace of mind. *Cf. Mental Health*

*Ass'n of Minn. v. Heckler*, 720 F.2d 965, 970 (8th Cir. 1983) (describing inability to pay for

needed medication and stress associated with attempting to obtain benefits as irreparable harm);

*LaForest v. Former Clean Air Holding Co.*, 376 F.3d 48, 55 (2d Cir. 2004) (citing health risks,

an inability to purchase necessities, and the anxiety associated with uncertainty as evidence of

irreparable harm).

That said, the Court reluctantly concludes that the evidence of irreparable harm submitted

by the retirees is not sufficient to justify a preliminary injunction.  Those who submitted

declarations regarding the harm that they have suffered do not appear to be representative of the

majority of class members.  The evidence indicates that class members have access to medical

and prescription drug plans and that a substantial majority of class members face relatively small

and readily calculable increases in monthly expenses over the course of this lawsuit.  Therefore,

the Court finds that the threat of irreparable harm is not strong enough to overcome the fact that

plaintiffs are unlikely to succeed on the merits.

### D.  Balance of Harms

Rexam does not offer any argument concerning the balance of the harms in this case,

although it does contend that the administrative costs of reestablishing the plans will be

significant, the plans themselves are costly to fund, and any payments that Rexam is mistakenly

required to make will be unrecoverable without a large bond.  Specifically, Rexam claims that it

costs over $250,000 per month to fund the plans. Def.'s Mem. Opp'n Prelim. Inj. 46-47.  In

contrast, plaintiffs offer evidence that Rexam is a financially robust company whose 2004 pre-

tax profits increased 26% over the year, to £300,000,000.  Martorana Decl. Ex. 27 at 28.  Thus,

the harm that plaintiffs would suffer if a preliminary injunction is denied outweighs the harm that

Rexam will suffer if a preliminary injunction is granted.  Again, though, the problem is that plaintiffs are not likely to win on the merits.

### E.  Public Interest

Plaintiffs argue that the public interest would be served by issuing an injunction because it would honor the contractual rights of the retirees and help keep them off public assistance.  If plaintiffs were likely to succeed, the former consideration would indeed weigh in their favor.  But they are not.  Also, as Rexam observes, Congress specifically chose to allow employers the flexibility to offer welfare benefit plans without having to undertake the difficult task of predicting the future cost of medical care.  *See United Paperworkers*, 961 F.2d at 1385-36.  The public-interest factor does not weigh heavily in this case, one way or the other.

### F.  Conclusion

Plaintiffs have demonstrated that at least some members of the class will suffer irreparable harm if a preliminary injunction is not issued and that the harm that these class members will suffer outweighs the harm that issuing a preliminary injunction will cause to Rexam.  But plaintiffs have not demonstrated that they are likely to succeed on the merits.  The Court has sympathy for plaintiffs — and the Court will attempt to minimize their harm by trying this case as soon as possible — but, on this record, the Court cannot justify taking the "extraordinary" step of issuing a preliminary injunction.  *Watkins*, 346 F.3d at 844.

ORDER

Based on the foregoing and on all of the files, records, and proceedings herein, IT IS

HEREBY ORDERED that plaintiffs' motion for a preliminary injunction [Docket No. 43] is

DENIED.

Dated: October  25,  2006                    s/Patrick J. Schiltz
                                             Patrick J. Schiltz
                                             United States District Judge